**STATE of Alaska, Appellant,**

v.

**Jay HEBERT, Appellee.**

**No. A–1743.**

Court of Appeals of Alaska.

Oct. 9, 1987.

Larri Irene Spengler, Asst. Atty. Gen., and Harold M. Brown, Atty. Gen., Juneau, for appellant.

Richard M. Burnham, Findley & Burnham, Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

In this case we are asked to consider the validity of 5 Alaska Administrative Code (AAC) 27.987, a fish and game regulation governing commercial herring fishing in Norton Sound. On February 6, 1986, Fish and Wildlife Protection officers charged Jay Hebert with violating 5 AAC 27.987.[1]

---

1. 5 AAC 27.987 provides:

*Superexclusive Use Areas.* (a) The Cape Romanzof and Norton Sound Districts are superexclusive use areas.

(b) A person who participates in the commercial taking of herring as a CFEC [commercial fisheries entry commission] permit holder in a superexclusive use area at any time from February 1 through June 30 may not participate or have participated in the commercial taking of herring, either as a CFEC permit holder or a crew member aboard a vessel used to take herring, in another superexclusive or non-exclusive use area at any time from February 1 through June 30 of that same year.

(c) A person who participates in the commercial taking of herring as a crew member aboard a vessel that is used to take herring in a superexclusive use area at any time from February 1 through June 30 may not participate or have participated in the commercial taking of herring as a CFEC permit holder in another superexclusive or non-exclusive use

Hebert was charged because he fished as an entry-permit holder in an exclusive use area, Norton Sound, after having already fished in nonexclusive-use areas, Bristol Bay and Security Cove, during the 1985 fishing season. On May 5, 1986, Hebert moved to dismiss the charge on the ground that the Board of Fisheries had exceeded its authority when it enacted 5 AAC 27.987. Hebert argued, *inter alia*, that the Board enacted the regulation to economically assist local fishermen, and, that such a goal did not serve a conservation or development purpose as required by AS 16.05.-221(a).

On August 18, 1986, District Court Judge Bradley N. Gater agreed that 5 AAC 27.987 exceeded the Board's authority and ordered that the charges be dismissed. He relied, in part, on an earlier decision of the Juneau superior court which interpreted a virtually identical earlier ordinance, 5 AAC 27.985. *See State v. Heffernan*, No. 83-032 Cr. (Alaska Super., May 14, 1985). The district court also concluded that the regulation was not premised on conservation and development purposes but, instead, was enacted solely to economically assist exclusive use area fishermen by distributing fishermen among different areas and dividing the overall herring catches more evenly. The state appeals. We reverse.

■ In reaching our decision, we first consider whether the Board exceeded its statutory mandate in promulgating the regulation, either by pursuing impermissible objectives or by employing means outside its powers. Second, we consider whether the regulation is reasonable and not arbitrary. *Meier v. State*, 739 P.2d 172, 173

(Alaska, 1987); *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

The Board's undisputed purpose in promulgating the regulation was to allocate a percentage of the herring yield to local residents larger than they would otherwise receive in unregulated competition with fishermen from outside the district. Hebert argues, and the trial court found, that this objective is outside the Board's statutory mandate because it is inconsistent with, and not reasonably necessary for, purposes of conservation or development.[2]

In *Meier* and, in an earlier case, *Kenai Peninsula Fisherman's Co-op. Ass'n Inc. v. State*, 628 P.2d 897, 903 (Alaska 1981), the supreme court considered and rejected arguments similar to Hebert's. In both cases, it held that the duty to conserve and develop fishery resources implied a concomitant power to allocate fishery resources among competing users. *Meier*, 739 P.2d at 174; *Kenai Peninsula*, 628 P.2d at 903. In *Kenai Peninsula*, the court reasoned that the Board's power to control resource utilization permitted it to establish priorities of use between commercial and recreational fishermen as a response to sharp competition between the two groups for a limited fishery resource. *Id.* at 903. In *Meier*, the court concluded that competition between various subgroups of commercial users was also keen and, consequently, the Board's power to control fishery resource utilization allowed it to allocate the fishery harvest between two competing subgroups of commercial fishermen. *Id.* at 174.

■ Implicit in *Meier* and *Kenai Peninsula* is the supreme court's conclusion that questions such as the one presented in this

area at any time from February 1 through June 30 of that year.

(d) A vessel used in the taking of herring in a superexclusive use area at any time from February 1 through June 30 may not be used or have been used in the taking of herring in another superexclusive or non-exclusive use area at any time from February 1 through June 30 of that year.

2. In order to determine whether 5 AAC 27.987 is consistent with and reasonably necessary to carry out the legislative purpose behind the establishment of the Board, *see* AS 16.05.221, we

must first construe both the statute and the regulation to determine their meanings. Since the meaning of the statute and the regulation, in context, are pure questions of law, we may exercise our independent judgment. *See State v. Aleut Corporation*, 541 P.2d 730 (Alaska 1975). Practically speaking, however, there is no dispute regarding the meaning of the regulation, and the supreme court has already interpreted the statute, in context, to determine its meaning. *See Kenai Peninsula Fisherman's Co-op. Ass'n Inc. v. State*, 628 P.2d 897, 903 (Alaska 1981).

case are divisible into two related issues: first, does the need for conservation or development permit the Board to regulate a particular fishery, *see* AS 16.05.221(a); and, second, assuming that conservation or development require restrictions on the amount of fish available for taking so that demand will exceed the available supply of fish, how should the available fish be allocated among competing potential users, whether sport, commercial or subsistence? The trial court's primary error was its failure to distinguish between these two issues. It viewed the Board's function as limited to generating regulations for the purpose of developing or conserving fishery resources, even if the regulation being evaluated sought solely to allocate the resources. While an initial decision to regulate requires a conservation or development purpose, a subordinate decision to allocate does not. *Cf. Meier*, 739 P.2d at 174 (Board's decision to handicap driftnetters for benefit of setnetters in order to maintain pre–1985 harvest percentages between the two groups did not directly advance a conservation or development purpose); *Kenai Peninsula*, 628 P.2d at 903 (allocation between commercial fisher, and sport fishers, standing alone, did not serve conservation or development purpose).

Nevertheless, the trial court, as well as Hebert, believes that the Board erred in finding that the prerequisites for an allocation decision had been met. Hebert contends that the Board's decision was not premised on a need to effectuate conservation or development of the Norton Sound herring stocks, but solely on a desire to economically assist the Norton Sound residents.

■ We find that whether the herring fishery resource in Norton Sound requires conservation or development is a question of legislative fact. *See, e.g., State v. Erickson*, 574 P.2d 1, 4–6 and n. 14 (Alaska 1978) (quoting Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv.L.Rev. 364, 402–10 (1942) (legislative facts are those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take)). The supreme court has promulgated a two-prong reasonable basis test to govern an administrative agency's decisions regarding legislative facts in rule-making. First, the regulation must be consistent with and reasonably necessary to carry out the statutory purposes of the agency. Second, the regulation must be reasonable and not arbitrary. *See Meier*, 739 P.2d at 173, and *Kelly*, 486 P.2d at 911. Applying this test to the instant case, we consider the Board's findings relating to 5 AAC 27.987.[3]

---

**3.** The findings are:

The Alaska Board of Fisheries has adopted regulations allowing participation in certain sac roe fisheries of the A–Y–K [Arctic-Yukon-Kuskokwim] area only by persons or vessels that have not also participated in other Alaska herring sac roe fisheries during the calendar year. While the board does not believe that exclusive use regulations are appropriate for all fisheries, it does believe that these regulations will serve the orderly conservation and development of those fisheries. In support of the regulations, the board finds:

(1) These fisheries are an important segment of the local economies of communities of the A–Y–K region. In most cases, there are few coastal if any employment alternatives to commercial fishing.

(2) The herring sac roe fisheries are only recently developing, and local fishers in general do not have sophisticated equipment or skills to apply to herring fishing, though they do have the capability to fully harvest and utilize all available resources.

(3) Herring fishers and other Alaska sac roe fisheries have generally developed highly refined fishing skills and acquire significantly more efficient fishing equipment, which if employed on a wholesale basis in the A–Y–K area would disadvantage A–Y–K fishermen and the communities that are dependent upon commercial fishing as a cash economy.

(4) In order to allow A–Y–K fishers the opportunity to acquire the skills and equipment so that they may fairly compete with those who participate in other Alaska herring sac roe fisheries, the board has adopted the exclusive use regulations. Exclusive use will allow A–Y–K fishers the time to develop those skills needed to be competitive, and income generated from the fisheries will assist them in upgrading equipment.

(5) Without the exclusive use regulations, the amount of effort in the fishery will increase, since other Alaskan herring sac roe fisheries would be over by the time the fisheries are conducted in the A–Y–K region. This would result in a shortened fishing season

■ Findings five and six make it clear that the Board did not view the herring sac roe fishery in Norton Sound as so extensive that it could meet the needs of all men and women who wished to fish, and therefore need not be regulated for purposes of development and conservation. In fact, it appears that the Board had the same concerns present in *Kenai Peninsula* and *Meier:* the need for allocation of a limited fishery resource between sharp competitors. In fact, it appears that an administrative finding that some limitation on the quantity of fish which could be taken was necessarily more explicit in this case than it was in either *Meier* or *Kenai Peninsula.* We note that neither the supreme court nor the agency, in either *Kenai Peninsula* or *Meier,* seems to have made a separate factual determination that respective salmon fishery resources required regulation for purposes of conservation or development before reaching the allocation decision.

■ Hebert challenges the Board's findings on a number of grounds. First, he contends that there is nothing in the record indicating that the Board ever adopted or discussed the February 1985 findings and that they therefore are a nullity. It is unclear from the record whether the entire Board ever ratified the findings or how the findings were adopted. The only references in the record to the findings are found in a letter to assistant attorney general Larri Irene Spengler from Elizabeth Stewart, the director of the Division of Boards, Department of Fish and Game, and in an affidavit by Elizabeth Stewart. The letter states that the findings were written after the board meeting had adjourned and that,

"there is no discussion on the tapes adopting the findings." The affidavit further states that time was not available during the November 1984 meeting for the findings to be drafted, discussed, and signed, that they consequently were finalized [sic] later. Ms. Stewart does not explain what she means by "finalized," though it appears that she is suggesting that the entire Board ratified the findings off the record.

Alaska Statute 44.62.310(a) provides that board meetings "are open to the public." AS 44.62.310(f) adds that "action taken contrary to this section is void." Applying these provisions, Hebert argues that the Board members' failure to discuss or adopt the findings of the November 1984 meeting violates the openness requirement and invalidates the findings.

Hebert is in error. Alaska Statute 44.62.310(a) addresses meetings, not findings. There is nothing in the Administrative Procedure Act requiring the Board to make any findings when exercising its quasi-legislative function.[4] *A fortiori,* there is nothing in the Act regulating the manner in which findings must be adopted or approved. As the supreme court noted in *Kelly,* when we examine the validity of a regulation, we apply roughly the same tests we would apply to a statute to determine whether it is reasonable. 486 P.2d at 911. Thus, the findings signed by the chairman of the board are the conceptual equivalent of a legislative committee report, which may be helpful in determining legislative or, in this case, administrative intent, but is hardly a condition prerequisite for the regulation or statute's validity.

---

and increased numbers of participants, diminishing the opportunity for A–Y–K fishers to develop fishing skills and diminishing the income generated to each participant, thus impacting the A–Y–K fishers' ability to acquire competitive equipment.

(6) Since the A–Y–K herring fisheries are so recently developed compared to other Alaska herring sac roe fisheries, the level of knowledge of the status of the herring resource is less than that of stocks elsewhere in Alaska. Regulations which reduce the amount of effort and the efficiency of the participants or which reduce the rate at which effort grows and efficiency increases are therefore necessary. A slower-paced fishery on stocks of

unknown magnitude, distribution, and resiliency is appropriate. Further, the significant degree of subsistence utilization of the herring resource in the A–Y–K region, compared to other regions of the state, supports the board's desire for a cautious, conservative regulatory environment.

4. It is necessary to constantly bear in mind that an agency record, and the conclusions and findings the agency draws from that record serve different purposes when the agency acts in a quasi-legislative, as opposed to a quasi-judicial capacity.

Consequently, we may consider the findings as one indication among many of the actual legislative factual determinations the Board made when it enacted the regulation.

 Finally, Hebert argues that there is no evidentiary basis in the administrative record for the Board's finding that the herring sac roe fisheries in Norton Sound require conservation, even if such a finding is implicit in the Board's actions. Hebert has confused administrative rule making, *see* AS 44.62.180–290, with administrative adjudication, *see* AS 44.62.330–630. It is only in the latter case that the agency is limited to the administrative record as a basis for decision making. *Compare* AS 44.62.500 (decision in contested case) *with* AS 44.62.560 (judicial review of agency adjudication). When an agency is considering promulgation of a rule or regulation, it is required by law to give notice and an opportunity to comment to those who potentially will be affected by a regulation. *See* AS 44.62.190; AS 44.62.210. The agency must consider all relevant matter presented to it before adopting, amending, or repealing a regulation. AS 44.62.210. The agency is not, however, limited to the "agency record" as a basis for making policy decisions, and may rely on its experience, its expertise, and any facts known to it from whatever source they are drawn. *See* 1 K. Davis, *Administrative Law Treatise* § 6.17 (2nd ed. 1978).[5] *See also* 1–3 *Administrative Law Treatise* §§ 6.12–16, §§ 12.5–9, §§ 15.8–14.

Consequently, we conclude that the Board's objective in promulgating 5 AAC 27.987—allocation of a fishery resource between resident and nonresident fishermen—is permissible. We are also satisfied that the means it employed were within its powers. *See* AS 16.05.251(a)(4). The Board may adopt regulations it considers advisable in accordance with the Administrative Procedure Act for regulating the means and methods employed in the pursuit, capture, and transport of fish. Final-

ly, we find that 5 AAC 27.987 is a reasonable and nonarbitrary regulation.

The judgment of the district court is REVERSED.

---

5. Neither AS 44.62.480 (governing "official notice" in agency adjudication) nor A.R.E. 201 (governing "judicial notice" in court proceedings), restricts an administrative agency in its legislative fact-finding in administrative rule making.